IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


TAMMY LYNN SMITH                                                          PLAINTIFF


v.                              Civil No. 10-3070


MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                            DEFENDANT

## MEMORANDUM OPINION

### I.      Procedural Background

Plaintiff, Tammy Lynn Smith, appeals to this Court from the decision of the Commissioner

of the Social Security Administration denying her application for supplemental security income

benefits ("SSI"), pursuant to §42 U.S.C. 405(g).

Plaintiff protectively filed her SSI application on October 4, 2005, alleging a disability onset

date of April 23, 2005, due to post-traumatic stress disorder ("PTSD"), carpal tunnel syndrome,

depression, arthritis, residuals from a wrist fracture, and attention deficit disorder. Tr.20, 65-66. At

the time of the application date, Plaintiff was thirty five (35) years old with a high school education.

Tr. 28, 71, 210.  She has past relevant work as secretary, companion, apprentice, and nursing aide.

Tr. 28, 66-67, 76-83, 481-484.

Plaintiff's application was denied at the initial and reconsideration levels.  Tr. 36-37, 39-42.

At Plaintiff's request, an administrative hearing was held on May 24, 2007.  Tr. 471-498.  Plaintiff

was present at this hearing and represented by counsel.  Tr. 471-498.  The ALJ rendered an

unfavorable decision on February 14, 2008, finding that Plaintiff was not disabled within the

meaning of the Social Security Act. Tr. 17-29. Subsequently, the Appeals Council denied Plaintiff's

Request for Review on June 22, 2010, thus making the ALJ's decision the final decision of the Commissioner.  Tr. 3-5.  Plaintiff now seeks judicial review of that decision.

## II.      Factual Background

Plaintiff has a history of status post three left knee surgeries and four right ankle surgeries. In 1995, Plaintiff fractured her right ankle after being thrown from a horse.  Tr. 283-289.  As a result, she underwent orthopedic fixation using screws.  Tr. 285-289, 334-338.  Plaintiff developed a nonunion at the lateral malleolus and in 1995, the medial malleolus screws were taken out and the fibula was plated.  Tr. 313, 350, 353.  X-rays of Plaintiff's right ankle, taken on January 2, 1996, revealed an orthopedic fixation with plating and total healing of the fracture.  Tr. 280.  At this time, Plaintiff underwent surgery to remove the fibula plate due to residual ankle pain and post-traumatic arthritis.  Tr. 281-282.

In January 1995, Plaintiff had a torn medial meniscus and torn anterior cruciate following a severe injury several years before.  Tr. 319.  Plaintiff underwent reconstruction of the left anterior cruciate ligament and a partial meninsectomy of her left knee.  Tr. 319-320, 343-344.  In 1997, Plaintiff was involved in a motor vehicle accident, in which she fractured her right wrist and left patella.  Tr. 321-324, 355-357, 362-363.  Plaintiff underwent a partial patellectomy with tendon reattachment and closed reduction of her radius.  Tr. 362-363, 369.  X-rays of Plaintiff's left knee, taken in November 1997, revealed evidence of a medial collateral ligament fixation, old comminuted patellar fracture, and a massive joint effusion.  Tr. 322.  Post-operative x-rays of Plaintiff's wrist showed good alignment.  Tr. 314.  Follow-up notes reveal that Plaintiff's wrist fractured healed well and her knee looked good.  Tr. 326, 328.

In July 2001, Plaintiff presented to W. Scott Bowen, M.D., with complaints of right ankle pain and weakness in her arms and legs. Tr. 382-383. On examination, Plaintiff had about half the normal range of motion in her ankle. Tr. 382. X-rays confirmed deformity of the fibula from previous fracture and tibial talar arthritis. Tr. 382. Dr. Bowen assessed Plaintiff with post-traumatic arthritis of the ankle and referred Plaintiff to UAMS for consideration of ankle arthrodesis or a total ankle replacement. Tr. 383.

In September 2001, Plaintiff saw Jonathan Craighead, M.D., an orthopaedic specialist, who noted that Plaintiff had post-traumatic arthritis of the right ankle with malunion of the right lateral malleolus and anterior and tibial talar osteophytes. Tr. 313-314. Dr. Craighead believed Plaintiff was too young for a total ankle replacement and that ankle arthrodesis should only be considered after all conservative measures have failed. Tr. 314. In October 2001, Plaintiff had osteophytes removed from her right ankle. Tr. 299-305. In June 2004, Plaintiff re-injured her right ankle. Tr. 276. X-rays revealed a partially healed old fracture with no new fractures. Tr. 276.

From January through March 2005, Plaintiff was treated by Mike C. Hendren, M.D., for anxiety. Tr. 133-136. On January 4, 2005, Plaintiff complained of anxiety related to her son. Tr. 135. Dr. Hendren diagnosed Plaintiff with situational anxiety disorder and prescribed Effexor and Xanax. Tr. 135. In February 2005, after complaining of visual disturbances, Plaintiff was switched from Effexor to Wellbutrin. Tr. 136. Dr. Hendren noted that she scored high on a attention-deficit/hyperactivity disorder ("ADHD") questionnaire. Tr. 134. Plaintiff also complained of arthralgia in her left knee and right ankle, for which Dr. Hendren prescribed Naprosyn. Tr. 134. In March 2005, Dr. Hendren switched Plaintiff to Cymbalta and encouraged Plaintiff regarding her new position as a personal care aide. Tr. 133.

On September 2, 2005, Plaintiff presented to Rural Health Clinic of Newton County with complaints of right ankle pain. Tr. 246. She was assessed with severe post-traumatic arthritis of the right ankle and depression. Tr. 246.

Plaintiff was referred to Arkansas Counseling Associates for counseling. Tr. 137-223, 385-417. In September 2005, Plaintiff was initially diagnosed with ADHD, predominantly inattentive, and given a Global Assessment of Functioning ("GAF") score of 45. Tr. 221-223. She reported past abuse by her sister and current family problems with her son. Tr. 209. Plaintiff was placed in individual counseling with Barb Kelly, a licensed social worker. Tr. 207. She was given a good prognosis with continued treatment. Tr. 207. In late September, Mark Brown, M.D., diagnosed Plaintiff with PTSD and major depression, for which she was prescribed Lexapro. Tr. 193-194, 214. On examination, Plaintiff was oriented times four and had good insight, appropriate attention/concentration, and normal memory/recall. Tr. 193. Dr. Brown noted that Plaintiff's mood was dysthymic and she was tearful, but remained cooperative. Tr. 193.

In October 2005, Plaintiff reported that she was feeling better, accomplishing things, and making friends, although her progress in meeting therapy goals was slower. Tr. 192. In November 2005, Ms. Kelly noted that Plaintiff's medication seemed to be helping and she was not experiencing any side effects. Tr. 184-187. Her mood had improved, but she still reported trouble finishing tasks and focusing. Tr. 184. In an illness assessment, Sarah Robertson, M.D., noted that Plaintiff was "moderately ill" and had experienced minimal improvement from treatment. Tr. 184. As a result, Dr. Robertson increased Plaintiff's dosage of Lexapro. Tr. 184. On November 14, 2005, Plaintiff was feeling very positive. Tr. 183. In December 2005, Plaintiff was still experiencing flashbacks of her childhood abuse. Tr. 179. In a three month treatment plan review, Plaintiff's estimated GAF

score was 50.  Tr. 172.

In January 2006, Plaintiff reported that she was better able to manage her children and had improved ADHD symptomology while taking medication.  Tr. 165.  She did, however, report some social anxiety although her overall anxiety and anger levels had improved.  Tr. 162-163.  She also reported an improvement in her ability to cope with family matters.  Tr. 161.  After complaining of being too sleepy, Plaintiff stopped taking her medication, which had a negative effect.  Tr. 156-157.  In March 2006, Plaintiff reported feeling less depressed.  Tr. 155.  At her six month review, Plaintiff was given a GAF score of 50.  Tr. 148.  Dr. Brown noted that Plaintiff's mental status examination was unremarkable and her main interest was getting a form filled out for her disability lawyer.  Tr. 314.  He found that Plaintiff was "moderately ill" and had minimally improved with treatment.  Tr. 144.  He also noted that Plaintiff had taken a variety of antidepressants, but had adverse reactions to all of them.  Tr. 144.  Dr. Brown changed Plaintiff's diagnoses to major depressive disorder, recurrent, moderate, and PTSD.  Tr. 144.  In May 2006, Plaintiff reported that Christopher Winslow, M.D., had changed her medication and she was feeling much better.  Tr. 138.  She reported having recently moved to "a great cabin in the woods."  Tr. 138.  Plaintiff's insight was good, her attention/concentration was appropriate, and her thought processes were intact.  Tr. 137.

On January 25, 2006, Plaintiff had a consultative physical examination performed by Shannon Brownfield, M.D.  Tr. 224-230.  Plaintiff reported a history of three surgeries to her left knee and four surgeries to her right ankle.  Tr. 224.  She experienced arthritis pain and PTSD.  Tr. 224.  She was taking Lexapro and Salsalate.  Tr. 224.  On examination, Plaintiff had normal range of motion in her cervical and lumbar spine, shoulders, elbows, wrists, hands, hips, and knees.  Tr. 227.  However, dorsiflexion was limited to 15 degrees in her right ankle and plantar flexion was

limited.  Tr. 227.  Dr. Brownfield noted that it was obvious Plaintiff had multiple surgeries to her

left knee, as her patella was deformed.  Tr. 228.  She also noted that Plaintiff limped due to her left

knee.  Tr. 228.  Plaintiff's reflexes were normal and she exhibited no muscle weakness or atrophy

and no sensory abnormalities.  Tr. 228.  Limb function was normal except that Plaintiff could not

walk on her heels and toes on the right and could not squat and arise from a squatting position.  Tr.

228.  Plaintiff's pulses were normal.  Tr. 229.  X-rays of Plaintiff's left knee revealed mild

degenerative joint disease with narrowing and mild osteoarthritic changes.  Tr. 229.  X-rays of

Plaintiff's right ankle revealed severe osteoarthritic changes.  Tr. 229.  Dr. Brownfield diagnosed

Plaintiff with osteoarthritis of the left knee, severe osteoarthritis of the right ankle, and PTSD.  Tr.

230.  She indicated that Plaintiff would be severely limited in her ability to twist her legs, lift, and

kneel, and moderately limited in her ability to walk/stand for a prolonged period of time.  Tr. 230.

On January 27, 2006, Plaintiff saw W. Charles Nichols, Psy.D., for a consultative mental

evaluation.  Tr. 231-235.  She related a history of ADHD, depression, panic attacks, and PTSD, for

which she took Lexapro.  Tr. 231.  She denied a history of inpatient psychiatric hospitalization or

suicide attempts.  Tr. 231.  On examination, Plaintiff was alert and oriented and had good social

skills, although mild signs of anxiety were noted.  Tr. 232.  No problems in mental process or

activity were noted. Tr. 232.  Plaintiff denied visual hallucinations, but reported hearing voices.  Tr.

232.  She reportedly had two panic attacks per week.  Tr. 233.  She also reported depression,

childhood flashbacks, insomnia (improved on medication), trouble concentrating, and a fear of going

out in public.  Tr. 233.

After administering intellectual functioning tests, Dr. Nichols estimated Plaintiff's

intelligence to be average to above average.  Tr. 233.  Dr. Nichols found no significant limitations

in the area of concentration, persistence, and pace, and he observed no physical limitations during the interview.  Tr. 234.  Plaintiff reported her daily chores as making the bed, washing laundry, cleaning the house, vacuuming, and sweeping.  Tr. 234.  She stated that her daughter prepares most meals and also grocery shops because she does not like going out.  Tr. 234.  Dr. Nichols diagnosed Plaintiff with PTSD, chronic, major depressive disorder, recurrent, moderate, and panic disorder with agoraphobia.  Tr. 234.  He estimated Plaintiff's GAF score at 52.  Tr. 234.  Dr. Nichols found that Plaintiff was able to understand and recall simple to moderately complex direction sequences, but opined that her social and public avoidance would affect her capacity to work with others.  Tr. 234. He determined Plaintiff would function best in a job with limited social contact.  Tr. 234.

In a Psychiatric Review Technique completed on February 9, 2006, Jay Rankin, M.D., found that Plaintiff did not meet the criteria for Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).  Tr. 248-265.  In a Mental Residual Functional Capacity ("RFC") Assessment, Dr. Rankin found that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 262-263.  He found no other significant limitations.  Tr. 262-263.

In a Physical RFC Assessment dated June 21, 2006, Jerry L. Thomas, M.D., found that Plaintiff had the RFC to occasionally lift/carry 10 pounds, frequently lift/carry less than 10 pounds, stand/walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull within those limitations.  Tr. 266-273.  Dr. Thomas found no postural, manipulative, visual, communicative, or environmental limitations.  Tr. 268-270.

In October 2006, Plaintiff re-established care with Arkansas Counseling.  Tr. 386-417.  Plaintiff was experiencing anxiety and flashbacks, and noted that she could not concentrate or focus.  Tr. 386, 396.  She also expressed fear about her sister getting out of prison.  Tr. 386.  Plaintiff reported her daily activities as reading, cleaning, and talking to her children.  Tr. 408.  On examination, Plaintiff's mood was appropriate, her thought processes were clear and organized, and her perception was normal.  Tr. 400-401.  She was oriented times four and her recent memory and insight were intact.  Tr. 401.  She denied any suicidal or homicidal ideation.  Tr. 401.  She was assessed with PTSD and ADHD.  Tr. 388, 402.  Dr. Robertson estimated Plaintiff's GAF score at 50.  Tr. 388.  As of November 2006, Plaintiff was not taking any medication.  Tr. 415.  She reported anxiety, which was not daily.  Tr. 416.  Dr. Winslow diagnosed Plaintiff with major depressive disorder, partial remission, and generalized anxiety disorder.  Tr. 417.  He determined Plaintiff's illness was "mild" and prescribed Lexapro.  Tr. 417.  In December 2006 and February 2007, Plaintiff's progress was rated at a three out of five.  Tr. 432, 435.

In a Medical Source Statement dated February 23, 2007, Barb Kelly, Plaintiff's counselor, found that Plaintiff was markedly limited in her ability to respond appropriately to changes in the work setting and moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from

psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 423-425. Ms. Kelly found mild limitations in five work-related categories and no significant limitations in nine work-related categories. Tr. 423-425. She noted that Plaintiff had anxiety attacks and flashbacks that could be triggered at any time or place. Tr. 425. She also noted that medication restraints had not been successful. Tr. 425.

In a Medical Source Statement dated March 2, 2007, Dr. Winslow found that Plaintiff was moderately limited in her ability to work in coordination with or proximity to others without being unduly distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and travel in unfamiliar places or use public transportation. Tr. 419-421. He found mild limitations in ten work-related categories and no significant limitations in two categories. Tr. 419-421.

### III.    Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether

evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits her physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform her past relevant work; and (5) if the claimant cannot perform her past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given her age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

## IV.    Discussion

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since October 4, 2005, the application date. Tr. 22. At step two, the ALJ found that Plaintiff suffered from mood disorder and right ankle disorder and associated pain, which were considered severe impairments under the Act. Tr. 22. At step three, he determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 22-23. At step four, the ALJ found that Plaintiff had the RFC to perform unskilled work where she could lift/carry a maximum of ten pounds occasionally and five pounds frequently, stand/walk for about two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Tr. 23-27. Additionally, the ALJ determined Plaintiff must not interact with co-workers beyond receiving work instructions. Tr. 23-27.

Based on this RFC, the ALJ determined Plaintiff could not perform her past relevant work. Tr. 28. However, after submitting interrogatories to a vocational expert, the ALJ determined there were sedentary, unskilled jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as small production machine operator, of which there are 500,000 jobs nationally and 4,000 jobs locally, small product assembler, of which there are 140,000 jobs nationally and 3,500 jobs locally, and production inspector, of which there are 36,500 jobs nationally and 800 jobs locally. Tr. 28-29, 116-122. Accordingly, the ALJ determined Plaintiff had not been under a disability, as defined by the Social Security Act, at any point from October 4, 2005, through February 14, 2008. Tr. 29.

Plaintiff contends the ALJ erred by: (1) failing to find post-traumatic arthritis of her left knee to be severe; and (2) determining she could perform work that is available in significant numbers in

the national economy. *See* Pl.'s Br. 2-9.

    A. <u>Severe Impairments</u>

Plaintiff contends the ALJ erred in failing to find her knee impairment to be severe. *See* Pl.'s Br. 2-3. This court agrees. Step two of the regulations involves a determination, based on the medical evidence, whether the claimant has an impairment or combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have "no more than a minimal impact on her ability to work." *Caviness v. Massanari,* 250 F.3d 603, 605 (8th Cir.2001), *citing Nguyen v. Chater,* 75 F.3d 429, 430-31 (8th Cir.1996). Although the Plaintiff has the burden of establishing a severe impairment or impairments, the burden at this stage is not great. *Caviness*, 250 F.3d at 605.

The ALJ's failure to identify Plaintiff's knee impairment as severe was not harmless error. As noted by the Eighth Circuit, the standard for determining whether a claimant suffers from a severe impairment is a low or *de minimus* standard. *See Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) (reversing the decision of the ALJ and holding that a diagnosis of borderline intellectual functioning should be considered severe when that diagnosis is supported by sufficient medical evidence). Here, Plaintiff's knee impairment is supported by the medical evidence of record. She had a total of three surgeries on her left knee. 224. In 1995, she underwent reconstructive surgery and had a partial meninsectomy of her left knee. Tr. 319-320, 343-344. In 1997, Plaintiff fractured her left patella and subsequently underwent a partial patellectomy with tendon reattachment. Tr. 362-363, 369. At

a consultative examination conducted on January 25, 2006, Dr. Brownfield noted that Plaintiff's left

patella was deformed and she limped due to her left knee. Tr. 228. X-rays of Plaintiff's left knee

revealed mild degenerative joint disease with narrowing and osteoarthritic changes. Tr. 299. Dr.

Brownfield assessed Plaintiff with osteoarthritis of the left knee and noted that Plaintiff would be

severely limited in her ability to twist her legs, lift, and kneel, and moderately limited in her ability

to walk/stand, due to her right ankle and left knee impairments. Tr. 230. While these records do not

establish that Plaintiff is *disabled* due to her knee impairment, they do provide sufficient evidence

to satisfy the low or *de minimus* standard for a severe impairment. As such, this case must be

reversed and remanded for further consideration.

    B. Residual Functional Capacity

    Although this case is remanded for other reasons, the court feels obligated to address

Plaintiff's remaining argument. Plaintiff contends the ALJ erred by giving controlling weight to the

opinions of Dr. Winslow, Ms. Kelly, and Dr. Nichols, but not including the specific mental

limitations assessed by each of these sources. *See* Pl.'s Br. 4-9. This argument is unpersuasive.

    The ALJ gave controlling weight to the *overall* opinions of Dr. Nichols, Dr. Winslow, and

Ms. Kelly to the extent they found that Plaintiff was limited in her social interactions but not totally

disabled. Tr. 26-27. At no point did the ALJ indicate that he agreed with each of these sources

regarding Plaintiff's mental limitations and their respective severity in *each* work-related category.

A review of the evidence reveals that the ALJ gave great weight to the opinions of these medical and

other sources in determining Plaintiff's overall mental RFC. While the court finds no error in this

analysis, there is some ambiguity regarding the very detailed hypothetical questions posed to the

vocational expert ("VE") and the ultimate RFC adopted by the ALJ. Tr. 23, 115-122. It is unclear

from the opinion whether the ALJ inadvertently or purposely excluded the specific hypothetical

limitations listed in the VE interrogatories.  This ambiguity should be addressed on remand.

**V.      Conclusion**

Accordingly, the undersigned concludes that the ALJ's decision is not supported by

substantial evidence and should be reversed and remanded to the Commissioner for further

consideration pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED this 27ᵗʰ day of July 2011.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE